NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

ADAM LEE SMITH, *Appellant*.

No. 1 CA-CR 15-0760
FILED 1-3-17

Appeal from the Superior Court in Yavapai County
No. P1300CR201300621
The Honorable Joseph C. Butner III, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Robert A. Walsh
*Counsel for Appellee*

David Goldberg Attorney at Law, Fort Collins, Colorado
By David Goldberg
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Kent E. Cattani delivered the decision of the Court, in which Judge Lawrence F. Winthrop and Judge Christopher T. Whitten[1] joined.

---

**C A T T A N I**, Judge:

¶1 Adam Lee Smith appeals his convictions and sentences for sale of methamphetamine, possession of drug paraphernalia, and resisting arrest. For reasons that follow, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2 Melissa Wood became an informant for the Partners Against Narcotics Trafficking ("PANT") task force in Yavapai County in early 2013, agreeing to make controlled drug buys from six individuals in exchange for the State reducing several felony charges she faced. After completing that agreement, she continued to make controlled buys for PANT, earning $100 for each buy. In her role as paid informant, Wood made three controlled buys of methamphetamine from Smith at his Prescott residence: two on May 16, 2013, and one on June 10, 2013.

¶3 Detective Hanna, Wood's PANT handler, testified that Wood, her purse, and her car were searched in a church parking lot before and after each purchase from Smith to ensure that Wood did not have any drugs or any money other than the money Detective Hanna had given her to purchase the drugs. Detective Hanna outfitted Wood with a recording device so the transaction could be monitored. Detective Hanna followed Wood from the parking lot to the driveway of Smith's residence, waited nearby, and followed her back to the parking lot after each drug buy.

¶4 The U.S. Marshals Service arrested Smith on June 11, 2013. Smith cursed when marshals approached the front door of his residence, then ran out the back door and around the side of the residence before a marshal pushed him from behind, causing him to fall face down. Another

---

[1] The Honorable Christopher T. Whitten, Judge of the Arizona Superior Court, has been authorized to sit in this matter pursuant to Article VI, Section 3 of the Arizona Constitution.

marshal employed a Taser because Smith was struggling to prevent the marshal from securing his hands.

¶5        The State charged Smith with three counts of sale of methamphetamine (one for each controlled buy), three counts of possession of drug paraphernalia, and one count of resisting arrest.  At trial, Smith's counsel argued that Wood had hidden drugs she purchased elsewhere and had lied about purchasing them from Smith.  This argument was based in part on (1) testimony from Wood's father that Wood was a pathological liar and not to be trusted; (2) testimony from Smith's longtime friend, a convicted felon with an admitted bias against PANT, who testified that he was with Smith during the third alleged controlled buy and that no such buy had occurred; and (3) admissions from Wood that she had several prior convictions, including one for felony theft, one for felony criminal impersonation (to avoid being arrested for driving on a suspended license), and one for shoplifting, and that she had worked for PANT to reduce charges of  burglary and trespassing.

¶6        The jury convicted Smith as charged.  The court sentenced him to concurrent terms of imprisonment, the longest of which is 15 years, for the sale and paraphernalia convictions, and to a consecutive term of 2.25 years' imprisonment for the resisting arrest conviction.  Smith timely appealed, and we have jurisdiction under Arizona Revised Statutes ("A.R.S.") § 13-4033.[2]

## DISCUSSION

### I.    Preclusion of Impeachment Evidence.

¶7        Smith argues that the superior court abused its discretion by precluding impeachment evidence relevant to Wood's credibility, depriving him of his right to present a complete defense.  We review evidentiary rulings for an abuse of discretion, but we consider constitutional issues de novo. *State v. Ellison*, 213 Ariz. 116, 120, ¶ 42 (2006).

¶8        Before trial, Smith sought to introduce evidence—under Arizona Rules of Evidence 608, 609, and 404(b)—of a series of specific instances of conduct to show that Wood repeatedly lied to and manipulated authorities, stole from acquaintances, bought and sold drugs from other sources during her PANT contract, and was subject to lax searches before and after the controlled buys.  Smith asserted that this evidence supported

---

[2]        Absent material revisions after the relevant date, we cite a statute's current version.

his defense that Wood fabricated her claims that he sold her drugs during the three controlled buys, and that Wood was a third party culpable for the offenses for which he was charged.

¶9        Rule 608(a) allows reputation and opinion evidence of a witness's character for untruthfulness.  Rule 608(b) gives the court discretion to allow cross-examination on specific instances of a witness's conduct if they are probative of a witness's character for untruthfulness, but precludes the use of extrinsic evidence other than prior convictions to prove collateral matters.  "Although a witness's credibility is always relevant, '[i]t is well settled that when impeaching a witness regarding an inconsistent fact collateral to the trial issues, the impeaching party is bound by the witness' answer and cannot produce extrinsic evidence to contradict the witness.'"  *State v. Lopez*, 234 Ariz. 465, 470, ¶ 25 (App. 2014) (alteration in original) (quoting *State v. Hill*, 174 Ariz. 313, 325 (1993)).  "Evidence is collateral if it could not properly be offered for any purpose independent of the contradiction."  *Id.* (citation omitted).  "The nearly universal rule proscribing impeachment on collateral matters is based on the questionable utility of such evidence and its potential for confusing or distracting the trier of fact."  *Id.* (citation omitted).

¶10        Rule 609 generally allows attacks on a witness's character for untruthfulness using evidence of convictions for offenses that require proof that the witness committed a dishonest act or made a false statement, or offenses that may be punished by more than one year, subject to balancing relevance against unfair prejudice under Rule 403.  Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

¶11        Other-act evidence is admissible under Rule 404(b) if the proponent has proved by clear and convincing evidence that the witness committed the other act, it is offered for a purpose other than to show propensity to act in the same manner, its relevance is not substantially outweighed by the potential for unfair prejudice, and the court provides a limiting instruction if requested.  *State v. Anthony*, 218 Ariz. 439, 444, ¶ 33 (2008).

¶12        Although "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense," *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quotation omitted), a defendant's right to present evidence is subject to restriction by application of reasonable evidentiary rules.  *See United States v. Scheffer*, 523 U.S. 303, 308 (1998).  Moreover, the

superior court retains wide latitude to impose reasonable limits on cross-examination. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

### A.    Prior Convictions and Police Investigations.

¶13    The superior court initially precluded admission of evidence showing that in 2011, Wood was pulled over for driving on a suspended license, and subsequently falsely reported to police that the person driving was a relative who had stolen her identity. The court found that the incident was too old and not probative of any issue at trial, and "could lead to a collateral mini-trial on this issue which would be cumbersome and confusing to the jury." The court also precluded admission of the facts underlying the police investigation of a claim that in August 2013, Wood impersonated the same relative when Wood was stopped for driving on a suspended license. The court allowed admission of evidence of the fact of Wood's conviction for criminal impersonation as a result of this incident, and concluded that admission of the conviction itself obviated any need to engage in further discussion of the underlying facts.

¶14    Nevertheless, at trial, the court overruled the State's objection to defense counsel's cross-examination of Wood that elicited limited details of both incidents, including the fact that Wood engaged in a subterfuge to avoid being caught driving on a suspended license and that she had involved her father in the first incident. Thus, the court ultimately allowed cross-examination on these specific instances of conduct, and precluded only the extrinsic evidence, as required by Rule 608(b). Accordingly, Smith's argument that the court erred by precluding this evidence fails.

¶15    The superior court precluded evidence of (1) a July 2013 police investigation showing that Wood was driving on a suspended license, had syringes and a glass pipe in her car, and had three credit cards in her purse belonging to other people, and (2) a police report in which she was cited for disorderly conduct in June 2013 for fighting with a roommate who had accused Wood of stealing her camera. The court found that the evidence was prejudicial, did not have sufficient relevance, and would result in a collateral trial of the underlying facts. Because these specific instances of conduct were not probative of Wood's character for untruthfulness as required for admissibility under Rule 608(b), the court did not abuse its discretion by precluding this evidence.

¶16    The court allowed admission of Wood's convictions for shoplifting and three other misdemeanors (offenses committed in January 2013 that gave rise to her original contract with PANT), but precluded evidence of the investigation into these incidents because the underlying

facts were not relevant and would give rise to a collateral trial. At trial, the court allowed defense counsel to cross-examine Wood on the underlying charges, and defense counsel in fact elicited testimony from Wood that she had been convicted of shoplifting, and originally had been charged with burglary and trespassing, arising from her conduct in occupying a house that was not hers, and for which she did not pay rent. The court acted within its discretion under Rule 608(b) by limiting cross-examination of Wood regarding the specific instances of conduct underlying the convictions, and by precluding extrinsic evidence of the underlying facts.

### B.     Allegations Against Detective Hanna.

¶17        The court precluded evidence of May 2013 allegations that Detective Hanna had told an officer to do a "quick search" of Wood's jeep in an unrelated controlled buy, and had written in his report that he had "observed" the controlled buy, even though he could only have heard it—allegations that were determined to be "unfounded" in a subsequent administrative review. The court reasoned that this was a "one-time incident," but nevertheless left "this door slightly ajar" to allow Smith to proffer "some other facts" establishing a "pattern" and relevance to this case. Smith did not ask the court to revisit the issue before or during trial. The court did not abuse its discretion by conditionally precluding this evidence, because it had little probative value on the issues in this case, particularly in light of the administrative finding that the allegations were unfounded.

### C.     Alleged Forgery of Smith's Name on Checks.

¶18        The court precluded testimony from a defense expert and from eyewitness J.S. indicating that in April 2013, Wood gave J.S. two forged checks (one of which she signed using the name Adam Smith) totaling $500 to pay a debt she owed J.S. A Department of Public Safety handwriting expert indicated that, without more information, Wood could not be excluded as the person who wrote the checks, nor definitively determined to be the person who wrote the checks, which the expert opined might have been written by two different people; in contrast, defense counsel's handwriting expert concluded that Wood's handwriting and the writing on the checks showed "excellent consistency."

¶19        The court allowed defense counsel to present the checks to Wood on cross-examination and ask her if she had written them, but precluded counsel from offering testimony from others to demonstrate that Wood had indeed forged the checks, reasoning again, "[w]e're not going to have a little mini-trial on that." On cross-examination, Wood testified that

she did not recall ever writing a check to J.S., and denied ever signing a check to J.S. in the name of Adam Smith (although defense counsel also elicited testimony that Wood gave a handwriting exemplar in the form of a check to J.S.). The court did not abuse its discretion under Rule 608(b) by precluding extrinsic evidence to rebut Wood's testimony.

¶20 Nor did the court abuse its discretion by declining to admit the evidence under Rule 404(b), despite Smith's assertion that it showed Wood had a "motive of ill will" against him or constituted general evidence of bias. In light of the dispute between the experts, the court reasonably could have concluded that Smith failed to prove by clear and convincing evidence that Wood forged the checks, as necessary to admit the evidence under Rule 404(b). *See Anthony*, 218 Ariz. at 444, ¶ 33. Similarly, the court reasonably could have concluded that the evidence would confuse the jury and unduly prolong the trial, and should thus be precluded under Rule 403. *See U.S. v. Young*, 952 F.2d 1252, 1258 (10th Cir. 1991) ("[A] trial judge can exclude evidence relevant to the witness's bias if its probative value is substantially outweighed by the danger of unfair prejudice.").

### D. Graan and Hopper Allegations.

¶21 The superior court also precluded testimony from Ashley Graan consistent with a video of her custodial interrogation by Detective Hanna in September 2013, in which Graan claimed that the ounce of methamphetamine she had purportedly sold Wood in an unrelated controlled buy at Wood's residence was "light" because Wood had gone to the bathroom and used some of the methamphetamine and had told Graan that she was going to "hold some out" for herself. Wood told Detective Hanna at the time that Graan had showed up earlier than expected, and that she had told Graan she was going into the bathroom to use methamphetamine simply as a ruse to call the detective to let him know what was happening.

¶22 Defense counsel offered Graan's statement to Detective Hanna to show *modus operandi* or pattern of conduct under Rule 404(b), to support Smith's defense that he did not furnish Wood the drugs, but rather she had acquired them elsewhere, as well as to impeach Wood's credibility. The court found that the evidence did not show *modus operandi* because it was not "even remotely similar" to the controlled buys from Smith, was irrelevant because it occurred four months after the controlled buys from Smith and thus could not have been a source for drugs she allegedly hid from Detective Hanna in those controlled buys, and would "certainly cause some confusion to the jury." Given the dispute over what had actually occurred, which would have required a mini-trial on collateral issues, the

court did not abuse its discretion by finding this evidence inadmissible under Rule 404(b). Nor did the court abuse its discretion by precluding cross-examination on this issue in light of Wood's assertion of her Fifth Amendment right to refuse to answer the preliminary question regarding whether she bought drugs in Phoenix for sale in Prescott during that time period.

¶23 Finally, the court did not abuse its discretion by precluding testimony from William Hopper that he had witnessed Wood purchasing drugs in Phoenix and selling them in Prescott when he lived with her. Smith offered the evidence "not just for character or impeachment purposes, but it helps [to] establish a *modus operandi*, a method and a manner of which Ms. Wood was operating and we believe did operate in connection with Mr. Smith . . . . our specific purpose is to demonstrate our defense of prevarication and false allegations." But Hopper's counsel informed the court that the couple's relationship only started in mid-July 2013, after the controlled buys at issue. The court thus reasoned that because the drug transactions that Hopper claimed to have witnessed occurred after the alleged controlled buys from Smith, they were not relevant "to what was going on with Ms. Wood in terms of getting drugs and being involved in drug sales and transactions during the time period in this case."

¶24 The court nevertheless deferred until trial a ruling on whether defense counsel could cross-examine Wood on this issue. At trial, Wood denied making trips to Phoenix to purchase drugs, and asserted her Fifth Amendment rights and refused to respond to a follow-up question regarding whether she brought the drugs back to sell in Prescott. The court did not abuse its discretion by precluding additional follow-up questions along this line—to which Wood would presumably have asserted her Fifth Amendment rights—and by precluding extrinsic evidence on this issue under Rule 608(b).

¶25 Smith also argues that the Graan and Hopper evidence was admissible as third-party culpability evidence. To be relevant, third-party culpability evidence, viewed in the light most favorable to its proponent, "need only tend to create a reasonable doubt as to the defendant's guilt." *State v. Gibson*, 202 Ariz. 321, 324, ¶ 16 (2002) (emphasis omitted); *State v. Bigger*, 227 Ariz. 196, 208, ¶ 42 (App. 2011). We review the superior court's ruling on the admissibility of third-party culpability evidence for an abuse of discretion. *State v. Prion*, 203 Ariz. 157, 161, ¶ 21 (2002).

¶26 The Graan and Hopper incidents were irrelevant to the third-party culpability defense because they occurred after the charged incidents.

*See Bigger*, 227 Ariz. at 209, ¶ 44 (reasoning that an incident implicating a third party that could not be connected temporally to the charged offense was properly excluded as "only a possible ground of suspicion against another") (citation omitted). Moreover, the superior court has discretion to exclude third-party culpability evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *State v. Machado*, 226 Ariz. 281, 284 n.2, ¶ 16 (2011) (quoting Ariz. R. Evid. 403). The court took these issues into consideration in ruling on the Graan and Hopper evidence, and did not abuse its discretion by excluding the evidence.

### E.    Character Trait of Fabrication.

**¶27**        Smith asserts that all of the above-referenced evidence was admissible under Rule 405(b) of the Arizona Rules of Evidence, which provides that "[w]hen a person's character or character trait is an essential element of a . . . defense . . . the character or trait may also be proved by relevant specific instances of the person's conduct." Smith argues that all of the evidence directly supported "an essential element of Appellant's defense—that Wood fabricated the three sales—and [was] therefore independently admissible . . . under . . . Rule 405(b)." But "[t]o be an 'essential element,' the character trait must be an operative fact which, under substantive law, determines the rights and liabilities of the parties." *State v. Williams*, 141 Ariz. 127, 129 (App. 1984). And "fabrication" is not such an element under the substantive law at issue. Accordingly, Smith's claim that the evidence was admissible under Rule 405(b) fails.

### F.    Constitutional Claim.

**¶28**        "[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane*, 476 U.S. at 690 (quotation omitted). This right is secured in part by the right to cross-examination provided by the Confrontation Clause of the Sixth Amendment. *Davis v. Alaska*, 415 U.S. 308, 315 (1974). But the superior court "retain[s] wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679.

**¶29**        The court did not violate Smith's constitutional right to present a complete defense in any of the above-referenced issues, because,

as outlined above, the court appropriately applied the evidentiary rules and imposed reasonable limits on cross-examination. Wood's character flaws were readily apparent, and the jury had ample evidence from which to assess her credibility.

## II. Evidence of Smith's Prior Drug Transactions.

¶30 Smith argues that the superior court abused its discretion by allowing Wood to testify on redirect examination that Smith had engaged in drug transactions with her other than those for which he was charged, as part of her explanation of responses to defense counsel during cross-examination about notes that she and Smith had exchanged. We review this evidentiary ruling for an abuse of discretion. *See Ellison*, 213 Ariz. at 129, ¶ 42.

¶31 The court allowed this testimony after concluding that defense counsel had opened the door by cross-examining Wood on her inability to produce notes relating to the charged drug transactions she purportedly told defense counsel about during a pretrial interview. The court had overruled the prosecutor's cross-examination objection, which was based on "misstatement of the evidence and the content of that interview," and the court thereafter overruled defense counsel's objection to the prosecutor's redirect questions, which were intended to clarify that Wood had not indicated that she had retained notes from the charged drug transactions, but rather that she and Smith had exchanged notes in other drug transactions.

¶32 "[W]here one party injects improper or irrelevant evidence or argument, the 'door is open,' and the other party may have a right to retaliate by responding with comments or evidence on the same subject." *Pool v. Superior Court*, 139 Ariz. 98, 103 (1984). "The rule is most often applied to situations where evidence adduced or comments made by one party make otherwise irrelevant evidence highly relevant or require some response or rebuttal." *Id.*; *see also State v. Kemp*, 185 Ariz. 52, 60–61 (1996). In this case, the court concluded that defense counsel's questioning left the false impression that Wood had told defense counsel the notes were from the three charged buys, and "[t]hat's why I allowed that limited bit of inquiry." The court acted within its discretion by allowing the clarification.

## III. Denial of Mistrial During Deliberations.

¶33 Smith argues that the court abused its discretion by denying a mistrial during deliberations after excusing a juror who claimed that "moral issues" had come up and that she could no longer be fair and

impartial.  Smith argues that the limited inquiry conducted by the court revealed that the juror concealed this moral issue during voir dire, depriving him of an additional peremptory strike of less objectionable jurors, requiring reversal.  Alternatively, he asks the court to remand for an evidentiary hearing to question the juror about her "previously undisclosed 'moral issues'" and to ask "related questions on why this was not answered in voir dire."

¶34        A declaration of mistrial is "the most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted."  *State v. Dann*, 205 Ariz. 557, 570, ¶ 43 (2003) (citation omitted).  We review the court's denial of a mistrial for an abuse of discretion.  *Id.*

¶35        Here, the record does not support Smith's speculative claim that during voir dire the juror concealed moral issues that prevented her from being fair and impartial.  Smith relies solely on the juror's response, "perhaps," to the court's initial inquiry, "Does this arise from moral issues that existed prior to you being selected as a juror in this case?"  But the juror responded to further questioning by the court and indicated that she believed during voir dire that she could be fair and impartial, but she "had something happen during the trial" that changed her ability to be fair and impartial, and her moral crisis did not occur "during the trial," but she was "having one now."   In addressing Smith's motion for mistrial, the court indicated that it viewed the juror's second statement as clarifying that she had not concealed anything from the court and the parties during voir dire.  Later, in addressing Smith's motion for new trial, the court noted that the juror had explained that she came into trial believing that she could be impartial, but that something changed during trial.  The court denied Smith's motion to bring the juror back in for questioning, reasoning, "I suppose we could bring her in and examine her ad nauseum, but she actually summarized the information we need to know right then and there.  And so I do not think it's appropriate that we bring her back in and revisit the issue."

¶36        Smith offers only speculation to suggest that the juror concealed material information during voir dire, and we thus decline to remand for an evidentiary hearing to explore this issue.  And we defer to

the court's factual finding on this issue, which is supported by the record.[3]
*See id.*

## IV.   Sufficiency of Evidence of Resisting Arrest.

**¶37**        Smith argues that the court erred by denying his motion for judgment of acquittal on the resisting arrest charge, asserting that his conviction should have been vacated because his conduct at the time of arrest was simply "turtling" during "30 seconds of passive resistance."  We review de novo the sufficiency of the evidence to support a conviction, considering both direct and circumstantial evidence.  *State v. West*, 226 Ariz. 559, 562, ¶¶ 15–16 (2011*)*.  In reviewing the denial of a Rule 20 motion, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at ¶ 16 (citation omitted).  Evidence is sufficient to support a conviction when "reasonable persons could accept [it] as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt."  *Id.* (citation omitted).

**¶38**        The offense of resisting arrest is defined in pertinent part as follows:

> A person commits resisting arrest by intentionally preventing or attempting to prevent a person reasonably known to him to be a peace officer, acting under the color of such peace officer's official authority, from effecting an arrest by:
>
> 1.    Using or threatening to use physical force against the peace officer or another;
>
> 2.    Using any other means creating a substantial risk of causing physical injury to the peace officer or another.

A.R.S. § 13-2508(A)(1)–(2).  In closing argument, the prosecutor conceded that Smith did not "us[e] or threaten[] to use physical force against the peace officer," and argued only that Smith used "any other means creating a substantial risk of causing physical injury to the peace officer."

---

[3]        Smith's claim also fails because he was not entitled to be tried by any particular jury, only a fair and impartial jury; he has made no claim that the final twelve jurors who convicted him were not fair and impartial.  *See State v. Goldston*, 133 Ariz. 520, 521 (1982).

¶39       The evidence at trial showed that Smith ran out the back door and around the side of his residence directly toward a marshal "at a pretty good pace" before another marshal pushed him from behind, and Smith fell against a fence, bounced off, and finally fell face down.  Immediately after falling face down, Smith "tucked his arms underneath him" and was "actively trying" to counter the marshal's efforts to "get his arms to pop out [to] get his arms behind his back."  Smith was described as a "heavy man," and he and the marshal were "struggling" and "wrestling" as the marshal attempted to secure Smith's hands.  The struggle lasted approximately 30 seconds and took place in a three to five foot area between the house and a chain link fence.  Another marshal, concerned because persons "alleged to have committed these type of offenses are generally armed . . . [and] the hands are what can kill you," shouted a warning before he employed a Taser, which enabled the marshals to handcuff Smith.

¶40       This evidence that Smith ran "at a pretty good pace" directly toward one marshal in a narrow corridor and then actively struggled in the same confined space with another marshal to prevent his hands from being cuffed, was sufficient to show that Smith created a substantial risk of physical injury, as necessary to support his conviction of resisting arrest.  Thus, Smith's reliance on *State v. Womack*, 174 Ariz. 108 (App. 1992), is unavailing, because the court in that case concluded that the defendant's mere flight, unaccompanied by physical contact with the officers, did not constitute resisting arrest.  *Id.* at 112–14.  The majority in *Womack* distinguished "resisting arrest," which requires "actual opposition or resistance, making necessary, under the circumstances, the use of force," from merely "avoiding arrest," which would include "an unsuccessful effort . . . to evade the police." *Id.* at 111–12.  Here, Smith's conduct involved "actual opposition or resistance, making necessary, under the circumstances, the use of force."  The evidence was thus sufficient to support a conviction for resisting arrest.

## V.      Sentencing under A.R.S. § 13-3407.

¶41       Smith argues that the court imposed an illegal sentence by finding (without a jury trial) that his prior guilty plea to possession of dangerous drugs for sale involved methamphetamine, as necessary to enhance his sentence under A.R.S. § 13-3407(E).  Before trial, the State filed an allegation of prior felony conviction pursuant to A.R.S. § 13-3407(E), specifically a 1997 conviction for possession of dangerous drugs for sale.  Section 13-3407(E) sets an enhanced sentencing range (presumptive term of 15 years) for possession of dangerous drugs for sale if the person had previously been convicted of possession of dangerous drugs for sale involving methamphetamine.

¶42      The indictment for Smith's 1997 conviction, incorporated by reference in his plea agreement, established the particular subsection under which Smith was convicted, that is, possession for sale of dangerous drugs, specifically methamphetamine.  The plea agreement signed by Smith on September 18, 1997, showed that he agreed to plead guilty to "possession of dangerous drugs for sale, in violation of A.R.S. § 13-3407, 13-3401, 13-701, 13-702 and 13-801, a Class 2 Felony, *as charged in Count I of the Indictment in CR97-0441*, committed [on] or about July 9, 1997."  (Emphasis added.)  Count I of the indictment in CR97-0441 charged that "On or about July 9, 1997, Adam Lee Smith knowingly possessed for sale a dangerous drug, to wit: methamphetamine, in violation of A.R.S. §§13-3407, 13-3401, 13-701[,] 13-702 and 13-801."  (Emphasis omitted.)  In 1997, A.R.S. § 13-3407(A)(2) prohibited the knowing possession of a dangerous drug for sale, and A.R.S. § 13-3401(6)(b)(xii) identified methamphetamine as a dangerous drug.  Although the judgment of conviction in CR97-0441 did not specify that the conviction for possession of a dangerous drug for sale involved methamphetamine, this technical omission does not alter the nature of the specific offense to which Smith entered a guilty plea and of which he was convicted:  possession for sale of dangerous drugs, to wit, methamphetamine.

¶43      Under these circumstances, the finding that this prior offense involved methamphetamine was not required to be submitted to the jury. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *see also Alleyne v. United States*, 133 S. Ct. 2151, 2163 (2013) (holding that the *Apprendi* rule also applies to any fact that increases the mandatory minimum sentence).  The finding that this prior conviction for possession of dangerous drugs involved methamphetamine was an issue of law for the court that falls within the *Apprendi* exception for the "fact of a prior conviction."  *See State v. Pandeli*, 204 Ariz. 569, 571, ¶¶ 6–7 (2003) (holding that the Sixth Amendment does not require a jury to determine the existence of a prior conviction of a "serious offense" as an aggravating circumstance in a capital case); *Cherry v. Araneta*, 203 Ariz. 532, 534, ¶ 8 (App. 2002) (holding that *Apprendi* permits the superior court to determine whether a prior conviction is a "violent crime" for purposes of a statutory denial of probation for commission of drug offenses).

¶44      Nor did the court's reliance on the indictment, incorporated by reference in the plea agreement, render the sentence illegal.  Courts may not use a charging document incorporated in the judgment of conviction to establish the factual nature of the prior conviction, but may do so to

establish the particular subsection under which a defendant was convicted. *See State v. Roque*, 213 Ariz. 193, 217, ¶ 88 (2006) (citing *State v. Thompson*, 186 Ariz. 529, 532–33 (App. 1996)); *cf. Mathis v. United States*, 136 S. Ct. 2243, 2252 (2016) (holding that *Apprendi* prohibits the court from "making a disputed determination about 'what the defendant and state judge must have understood as the factual basis of the prior plea' or 'what the jury in a prior trial must have accepted as the theory of the crime.'") (citations omitted).[4] Accordingly, the superior court did not engage in judicial fact finding by finding that Smith's prior offense involved methamphetamine, and was instead simply determining "what crime, with what elements, the defendant was convicted of." *Mathis*, 136 S. Ct. at 2252; *see also Roque*, 213 Ariz. at 217, ¶ 88. Accordingly, the superior court did not err by finding that Smith's 1997 conviction for possession of dangerous drugs for sale involved methamphetamine, and thus constituted a predicate offense for imposition of an enhanced sentence under A.R.S. § 13-3407(E).

**CONCLUSION**

**¶45**         For the foregoing reasons, we affirm Smith's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:         JT

---

[4]         Smith's reliance on *State v. Brown*, 210 Ariz. 534 (App. 2005) *affirmed in pertinent part*, 212 Ariz. 225 (2006), is misplaced. In *Brown*, the court held only that the "facts that a defendant admits during a change-of-plea colloquy that go beyond the elements of the offense or the facts inherent in the finding of guilt may not be regarded as established because there has been no jury finding or its equivalent on such facts." *Id.* at 541–42, ¶¶ 20–21. Here, Smith signed a plea agreement in which he agreed to plead guilty to the possession of dangerous drugs for sale as charged in Count I of the indictment, which identified the dangerous drug as methamphetamine. In doing so, Smith knowingly, voluntarily, and intentionally relinquished his right to have a jury decide those facts, which were necessary to his conviction.